PASOTEX PETROLEUM COMPANY, a corporation, Plaintiff in Error,

v.

The BRITISH–AMERICAN OIL PRODUCING COMPANY, a corporation, Defendant in Error.

Nos. 40649, 40650.

Supreme Court of Oklahoma.

Dec. 6, 1966.

Rehearing Denied Feb. 17, 1967.

Baker, Botts, Shepherd & Coates, Houston, Tex., Monnet, Hayes, Bullis, Grubb & Thompson, Oklahoma City, for plaintiff in error.

Jack Corman, Dallas, Tex., Fowler, Rucks, Baker, Jopling, Gramlich & Mee, Richard W. Fowler, R. C. Jopling, Jr., Oklahoma City, for defendant in error.

DAVISON, Justice.

This is an appeal by Pasotex Petroleum Company (defendant below) from a judgment awarding to The British-American Oil Producing Company (plaintiff below) a one half interest in a large number of oil and gas leases that had been acquired by defendant, and covering a considerable area of land in Love County, Oklahoma. In connection therewith the trial court required defendant to render an accounting of its costs and expenses in acquiring such leases and in developing the properties and the amounts received by it from sale of production from the leased lands. We will continue to refer to the parties by their trial court designation.

Plaintiff's action was in the nature of a suit for specific performance to establish that it owned an undivided one half interest in certain renewal oil and gas leases and additional oil and gas leases allegedly acquired by defendant for the joint benefit of plaintiff and defendant, and to require defendant to assign such interest to plaintiff and furnish an accounting in connection therewith. Plaintiff's action was based upon the provisions of two written contracts the parties had entered into in 1955 and 1956. Defendant denied plaintiff was entitled to such interests on the ground that the 1956 contract was a novation and superseded the 1955 contract and that plaintiff had failed to perform and satisfy the obligations imposed on plaintiff by the 1956 contract.

The basis of the judgment was that the circumstances were such that a trust relationship was created between the parties whereby defendant had acquired the leases for the joint benefit of both parties. The trial court reached this conclusion from its interpretation of the provisions of the written contract between the parties, made in July, 1955, and a later verbal understanding resulting from negotiations between the parties in the latter part of 1955 and early part of 1956.

The record reflects that on July 21, 1955, defendant owned oil and gas leases on approximately 10,000 acres of land in Love County and that a predecessor affiliate of defendant had, about 1949, drilled a dry hole in the leased area in Section 30, Township 7 South, Range 3 East, to a depth of 10,264 feet into the Caney formation. This hole was known as the "Calco-Brannan" well. The mineral rights from the surface to the base of the Caney are herein referred to as the "shallow rights."

Defendant wanted to secure further tests to the base of the Caney (shallow rights)

and also a test to ascertain the presence and productivity of the Basal Oil Creek Sand at an estimated depth of about 14,000 feet. The mineral rights below the base of the Caney are hereinafter referred to as the "deep rights." To secure these tests, the defendant negotiated and entered into a contract with plaintiff (herein called the "1955 agreement") consisting of a letter from defendant, dated July 21, 1955, and a letter of acceptance from plaintiff, dated August 3, 1955. In said 1955 agreement it was provided that plaintiff would begin a well by August 15, 1955, and drill 7,000 feet or into the Caney, if found at a lesser depth, and would begin a second well by March 1, 1956, and drill 9,000 feet or into the Caney, if found at a lesser depth, and further provided that if plaintiff drilled the two wells, defendant would assign to plaintiff a one half interest in defendant's leases, as outlined on an attached map, but limited to the shallow rights (to the base of Caney). The 1955 agreement also provided that if plaintiff drilled the two specified wells, then plaintiff had the option to begin drilling a well within one year from the date of the agreement and test the Basal Oil Creek Sand and, if plaintiff drilled the deep well, then defendant would assign to plaintiff a one half interest in said leases as to the deep rights (below the base of Caney).

Paragraph 9 of the 1955 agreement provided that either party could secure renewals of any expiring leases or acquire additional leases within the outlined area, for the joint account of both, and the other party (upon notice) could acquire a one half interest therein by paying one half of the cost thereof, and if not electing to do so the lease belonged to the acquiring party. As heretofore stated, the controversy is whether plaintiff is entitled to an interest in renewal leases and additional leases acquired by defendant. Paragraph 9 was one of the factors relied upon by the trial court in determining that plaintiff was entitled to a one half interest in any such leases.

Plaintiff drilled the first shallow well and it was dry. Early in 1956 the plaintiff commenced drilling the second shallow well and it was completed as a dry hole. In accordance with the 1955 agreement the defendant assigned to plaintiff a one half interest in leases in the circumscribed area that defendant owned on July 21, 1955, but limited only to the shallow rights. During this time plaintiff did not exhibit any intent to drill the deep test to the Basal Oil Creek Sand and would not make any commitment in that respect, although defendant was urging it to do so.

In the latter part of 1955, both plaintiff and defendant knew and recognized that the terms of leases on about 1000 acres would expire in 1956 and 1957 unless they were extended by drilling or renewal leases. This was admittedly a matter of serious concern to both parties. This was discussed by the parties by telephone, by teletype messages, and in two meetings of representatives of the parties in about November, 1955, and about January or February, 1956. It was the position of defendant that plaintiff's interest in any renewals would extend only to the shallow rights and that plaintiff's interest in such renewals would extend to the deep rights only if plaintiff drilled the deep test well to the Basal Oil Creek Sand. It was plaintiff's position that its interest in any renewals should be unlimited as to depth. We have carefully examined all of the evidence regarding this dispute and it is our conclusion that neither party definitely relinquished their respective positions and that the dispute was not clearly settled. However, it does appear that it was agreed that an employee of defendant, who was familiar with the area and lessors, would secure renewals and new leases within the outlined area and there was testimony that plaintiff would pay half of the employee's salary for the time spent in such activity. Defendant secured some 39 renewals and plaintiff acquired 11 leases prior to August 21, 1956.

It is pointed out that the trial court believed these negotiations resulted in an "agreement" that fixed and established the interests of the parties in any renewal and new leases acquired by either party after the 1955 agreement and even after the parties had consummated the 1956 agreement.

The parties continued to discuss the drilling of the deep test well and then made the 1956 agreement. This agreement consisted of a letter from defendant dated July 18, 1956, and an answering letter from plaintiff dated August 7, 1956. The introductory paragraph stated the agreement constituted the complete agreement of the parties relating to the Basal Oil Creek Sand test well to be drilled by plaintiff and was substituted for and in lieu of that part of the 1955 agreement relating to a proposed Basal Oil Creek Sand test well.

The 1956 agreement further provided, inter alia, that:

1. Plaintiff would, on or before September 1, 1956, commence drilling and prosecute the drilling of a well to a depth sufficient to penetrate and test the Basil Oil Creek Sand unless an impenetrable formation or geological or mechanical conditions were encountered which made further drilling impracticable, in which event plaintiff's obligation was terminated, but plaintiff had the option and privilege of beginning another well at a mutually agreed location.

2. If plaintiff drilled the well or additional well as specified, then defendant would assign to plaintiff a one half interest in the leases in the outlined area that defendant had acquired *prior to July 21, 1955,* but limited to the zones below the base of the Caney (deep rights), and in addition defendant would pay plaintiff $40,000.00.

3. As to all leases renewed or otheracquired within the outlined area by either party *after July 21, 1955,* and to *commencement of drilling of the well,* each was given an opportunity to acquire a one half interest therein by paying one half of the "total cost of acquisition" thereof.

4. If plaintiff earned the assignment covering a one half interest in all zones in excess of the Caney (deep rights) by complying with the provisions of the agreement (drilling the deep test), then each party was given an opportunity to acquire a one half interest in all leasehold, mineral or other interest in land whatsoever, acquired by either party in the outlined area "subsequent to the time the acreage is jointly owned as a result of your (plaintiff's) compliance with the terms of this agreement and as long thereafter as British-American or Pasotex owns any leasehold or royalty interest in the area outlined," by paying one half of the total cost of acquisition.

Plaintiff began drilling the deep test on August 21, 1956.

On September 12, 1956, plaintiff assigned to defendant a one half interest in 3 leases bearing dates April 7, 9, and June 6, 1956, and did on October 5, 1956, assign to defendant a one half interest in 8 leases bearing dates August 9 and 13, 1956. The assignments were without limitation as to depth.

Plaintiff had reached a depth of 11,200 feet by December 27, 1956, and advised defendant the formation was running low and that plaintiff was considering stopping and moving over and deepening the first shallow well (Green) drilled under the 1955 agreement. Defendant objected to the stoppage of drilling, and after an exchange of communications, the plaintiff on January 11, 1957, sent defendant a letter advising defendant that plaintiff had abandoned the well and intended to plug it, and that plaintiff did not intend to attempt an additional well in accordance with the option provided in the contract. This letter will be further set forth and discussed in a subsequent portion of this opinion.

The matter of plaintiff's stoppage of drilling of the deep test and, the question of whether such stoppage relieved defend-

ant of any obligation to assign to plaintiff an interest in renewal leases, even those acquired before the 1956 agreement, continued to be a subject of discussion between the parties. However, on May 29, 1957, defendant transmitted to plaintiff an assignment of a one half interest in 39 leases covering 1068.84 acres, and bearing dates between February 7, 1956, and August 16, 1956, both inclusive, except one lease dated January 25, 1955, originally given to K. L. McKinney. The record shows defendant acquired this latter lease between the January or February, 1956, meeting and July 18, 1956. In defendant's transmittal letter the leases were listed and described as to dates, parties, recording, property description, and the amount of bonus and commission paid for each lease, totaling $58,487.11. The letter set forth a charge of $75 per day for 30 days ($2250) expense. Reimbursement of one half of these amounts was requested and plaintiff paid the same. This assignment was without any limitation as to depth. In this connection we observe that written communications within plaintiff's organization reflect that prior to receipt of such assignment the plaintiff knew that defendant was acquiring renewal leases within the area, and also that "there was a considerable degree of uncertainty as to whether or not British-American would be entitled to participate in such," and further, that upon receipt of the assignment the plaintiff knew the assignment covered renewal leases to the time the deep test was commenced (August 21, 1956) in the area.

On June 18, 1957, defendant went into the old Calco-Brannan dry hole that had been drilled by defendant's predecessor affiliate in 1949, supra, and completed it to a depth of 13,213 feet in the Basal Oil Creek Sand on November 25, 1957, as a valuable gas and distillate producer. In all, defendant drilled some 12 wells within the outlined area of which 9 or 10 were producers. The result was that a valuable oil and gas property was discovered and developed and at least a part thereof has been incor-

porated into a Corporation Commission Unitization Plan.

In the meantime the plaintiff and defendant had been corresponding relative to plaintiff's right to an assignment from defendant of a one half interest in a certain (Reid) renewal lease, without limitation as to depth, that defendant had acquired after August 21, 1956, and running from October 2, 1956. In a letter dated October 18, 1957, defendant refused to give an assignment unlimited as to depth. The trial court held that this letter terminated the arrangement or agreement it found to exist between the parties whereby they would share equally in any renewal leases.

The trial court found and held that the 1956 agreement did not supersede the 1955 agreement, and that such agreements and the intervening oral arrangement or agreement had a common purpose and the later agreements merely modified and complemented those prior in time. The judgment awarded plaintiff a one half interest in all renewals and new leases acquired by defendant subsequent to the commencement of drilling of the deep test well on August 21, 1956, and to October 18, 1957, and in 14 renewals of such renewal leases made after October 18, 1957. The judgment ordered defendant to render an accounting to plaintiff.

Plaintiff admits that it did not drill the deep test well as specified in the 1956 agreement. It is not controverted that defendant assigned to plaintiff a one half interest (with no limitation as to depth) in renewals and new leases acquired by defendant between the 1955 agreement and commencement of drilling of the deep test well on August 21, 1956, and that plaintiff paid one half of the cost thereof. In the interval between August 21, 1956, and October 18, 1957, defendant acquired some 78 renewals and thereafter the 14 renewals of said renewal leases. These leases and the right of plaintiff to a one half interest therein constitute the subject matter of this phase of the controversy. The cost to defendant of these leases was $193,592.50 and

the judgment required plaintiff to pay one half of such amount with interest at 6% per annum, from the respective dates the defendant paid for the leases, to the date of judgment.

The judgment also provided that defendant be reimbursed for plaintiff's share of the costs of drilling, development, operation and marketing of production, including dry holes and unprofitable wells, and including cost of erection and operation of facilities of the Southeast Marietta Basal Oil Creek Sand. It was directed that such reimbursement was and is to be made from plaintiff's share of production, but with no interest. As of October 31, 1961, plaintiff's share of such costs was $2,814,007.88, and plaintiff's share of proceeds of sale of production attributable to plaintiff's interest in the leases was $279,036.39.

Defendant contends that the 1956 agreement superseded and took the place of any and all prior agreements, arrangements and controversies, and that plaintiff had failed to drill the deep test well as specified in the 1956 agreement and therefore had failed to earn and was not entitled to share in any lease renewed or acquired by defendant after plaintiff began drilling the deep test well on August 21, 1956.

The above narration of facts reflect that immediately prior to the making of the 1956 agreement the situation then existing was that plaintiff had acquired a one half interest in the leases the defendant owned at the date of the 1955 agreement, but limited to the shallow rights; that plaintiff had not exercised its option to drill a deep test and had not earned the deep rights in such leases; that there existed the matter of renewals and new leases acquired after the 1955 agreement and both parties had acquired such leases; and the parties were negotiating for a new agreement. The parties then made the 1956 agreement, therein stating it "will be substituted for and in lieu of" that portion of the 1955 agreement relating to a proposed deep test well. For the purpose of clarity we repeat that the 1956 agreement further provided

that upon drilling the well the plaintiff would have a one half interest in the deep rights under all leases held by defendant prior to the 1955 agreement and in addition the sum of $40,000; that each had the right to acquire a one half interest in all leases acquired by the other between July 21, 1955, and commencement of the well, upon payment of one half of the total cost of acquisition; and that if plaintiff earned (by drilling a deep test well) a one half interest in all zones in excess of the Caney (deep rights), then each had the right to acquire a one half interest in all leases, minerals or other interest in land acquired by either party subsequent to the time the acreage was jointly owned as a result of plaintiff's compliance with the agreement and as long as either owned mineral interests in the outlined area, upon payment of one half the total cost of acquisition.

■ The 1956 agreement was not consistent with the combination of the 1955 agreement and the intervening oral arrangement or agreement as interpreted and relied upon by the plaintiff and the trial court. The prior agreements would have permitted plaintiff to acquire an interest in all later renewals by merely paying one half the cost thereof. The 1956 agreement divided the renewals and required plaintiff not only to pay one half the cost, but also obligated plaintiff to furnish additional consideration in the form of commencing a well, in order to secure an interest in renewals to the date of such commencement. Said agreement called for additional consideration from plaintiff by requiring plaintiff to earn the deep rights before it was entitled to share in renewals and leases and interests thereafter acquired by defendant. This is the only reasonable and fair interpretation that can be given to the 1956 agreement.

It appears that if there is any ambiguity in the 1956 agreement, with regard to sharing in renewals, it is limited to the period between commencement of the well and the time when plaintiff would have earned the assignment of an interest in the

deep rights. During this period and until plaintiff's letter of January 11, 1957, the defendant made renewals of 4 leases with very limited acreage. If plaintiff had in fact drilled a deep test well then this would have necessitated an interpretation of the 1956 agreement as to whether such act entitled plaintiff to share in renewals from commencement, or from completion, of the well. Plaintiff did not drill the deep test well as specified in the 1956 agreement. As heretofore demonstrated, the 1956 agreement settled not only the subject of drilling a deep test well, but it went further and embraced, and made provision for, plaintiff sharing in renewals and lease acquisitions by ways and upon conditions that were different and inconsistent with all prior agreements on that subject. It is our opinion that the 1956 agreement superseded all prior agreements between the parties and that plaintiff's right to share in renewals and new acquisitions must be governed by that agreement.

A considerable portion of plaintiff's evidence to show defendant recognized or admitted plaintiff's right under the 1955 agreement to share in renewals and new leases without limitation and to substantiate the intervening oral agreement to the same effect, relate to statements and communications made by defendant's representatives prior to the 1956 agreement. In view of our conclusion above that the 1956 agreement superseded all such prior agreements we must regard such statements and communications as having merged in the 1956 agreement along with the agreements to which they refer or are connected.

Plaintiff also relies upon written communications between the parties relating to renewal of the "Reid" lease to show defendant's recognition of the continuance of the 1955 agreement and verbal agreement, and to show the 1956 agreement was merely a modification of such agreements. These communications began September 13, 1956, and continued into 1958 and therefore were after the 1956 agreement. Plaintiff had previously acquired a one half interest in the shallow rights in the original Reid lease by reason of drilling the 2 shallow wells under the 1955 agreement. A dispute arose between defendant and Reid as to whether this lease had expired and on September 13, 1956, (while plaintiff was drilling the deep test) defendant suggested to plaintiff that a renewal lease be taken. Plaintiff approved and the parties in effect released the original lease by assigning it to Reid. It appears this method was at Reid's request. Defendant took a new 4 year lease running from October 2, 1956. On August 8, 1957, (after plaintiff had stopped drilling) defendant sent plaintiff an assignment of a one half interest in the new lease limited to the shallow rights. Plaintiff returned this assignment, requesting an assignment covering all depths.

Defendant then sent plaintiff the letter of October 18, 1957, stating that plaintiff had only earned the shallow rights in the original lease and plaintiff was only entitled to the same rights in the new lease, and, since plaintiff had failed to drill the deep test well required by the 1956 agreement, the "obligation" of either party to offer the other a one half interest in any renewal leases expired 60 days after plaintiff's cessation of operations on the deep test well. Plaintiff urges that the last portion of the letter reflects defendant was and is inconsistent in its position as to plaintiff's right to share in renewals and shows a recognition of such right after the 1956 agreement. We do not reach the same conclusion. From our examination of the letter it clearly appears to us that defendant was relying on the 1956 agreement and plaintiff's failure to drill the deep test as grounds for refusing to give an assignment covering all depths. The term "obligation" used therein when considered in context with other portions of the letter, undoubtedly means the contin-

gent ·obligation to share renewals that would have matured or become enforceable upon plaintiff's performance of the condition of commencing and drilling a deep test well. It appears that the language in the letter regarding "60 days after cessation of operations" does not relate to anything in the 1956 agreement or in the record. However, the presence of this extraneous language does not persuade us to give the letter an interpretation different from that above expressed. In a letter of plaintiff dated February 17, 1958, it clearly stated its reliance upon the 1955 agreement. In defendant's answering letter of May 7, 1958, the defendant again definitely stated it relied upon the 1956 agreement and that the right to share in renewals expired August 21, 1956.

As stated, the assignment of May, 1957, clearly revealed that defendant was assigning to plaintiff a one half interest only in leases acquired by defendant prior to commencement of the well on August 21, 1956. This showed defendant was relying on the 1956 agreement as being the final and complete agreement of the parties with regard to sharing any and all leases acquired after the 1955 agreement. It is our opinion after a careful examination of the entire record that it was the intention of the parties that the 1956 agreement was in fact the final and complete agreement of the parties.

In Rose v. Roberts, 195 Okl. 687, 689, 690, 161 P.2d 851, 853, we quoted with approval from Black on Rescission of Contracts, 2d Ed., Sec. 530, as follows:

" 'Where the parties to an existing contract enter into a new agreement, completely covering the same subject-matter, but containing terms which are inconsistent with those of the earlier contract, so that the two cannot stand together, the effect is to supersede and rescind the earlier contract, leaving the later agreement as the only agreement of the parties on the subject.' "

In 12 Am.Jur., Contracts, Sec. 433, it is stated:

"A contract need not be rescinded by an express agreement to that effect. The rule is well settled that the parties to a contract may rescind it by making a new contract inconsistent therewith. If the parties to a contract make a new and independent agreement concerning the same matter and the terms of the latter are so inconsistent with those of the former that they cannot stand together, the latter may be construed to discharge the former. * * *"

See also Lewter v. Holder, Okl., 348 P.2d 845, and 17A C.J.S. Contracts § 395, p. 475.

Defendant further contends that plaintiff breached the 1956 agreement and earned no rights to leases acquired by defendant subsequent to August 21, 1956, and further, that defendant renounced, waived and abandoned any right it had to drill a deep test well at an alternate location.

One of the provisions of the 1956 agreement (supra) was that plaintiff would begin and prosecute drilling a well in a good faith effort to penetrate and test the Basal Oil Creek Sand unless an impenetrable formation or geological or mechanical conditions were encountered at a lesser depth which made further drilling impracticable, and in such event plaintiff's liability and obligations "hereunder," including its obligation to drill the well to the specified depth, "shall be terminated." Provided, plaintiff had the option to commence drilling an additional well to said sand at a mutually agreed location and thereby be entitled to receive the same assignments of leases and rights and privileges. As heretofore narrated, plaintiff apparently concluded when it reached a depth of 11,200 feet that the formation was running so low that it was justified in stopping drilling. There then ensued the exchange of communications between the parties, with defendant demanding plaintiff continue the drilling of the deep test well and plaintiff protesting the practicability thereof. The

parties never reached an agreement on this proposition.

The plaintiff then sent defendant the above mentioned letter of January 11, 1957, which stated in part as follows:

- "* * * we do not believe this company assumed any obligation to your company under the contract of July 18, 1956.

"We believe that we were given the right to earn deeper rights in this area upon drilling and completing an Oil Creek test well in the manner stated in the agreement.

"* * * after drilling the * * * well to a depth below 11,400' in a bona fide effort to penetrate the Oil Creek formation, we encountered geological conditions which made further drilling impractical and imprudent.

"* * * as we understand our contract with you, we have the option of still earning the deep rights provided in the contract by commencing another Oil Creek test well at a mutually acceptable location * * *

"Let me state here that we have abandoned the * * * well and do intend to plug it * * *

"We do not intend to attempt an additional well in accordance with the option so to do which is provided in our contract."

In the course of the trial both parties introduced a great amount of evidence consisting of expert opinion testimony, drawings, maps and charts, with regard to the geological formations in the area, and to sustain their respective contentions as to the depth and the probability or improbability of finding and securing production in the Basal Oil Creek Sand at the location of the deep test well. This evidence was offered on the question of whether plaintiff was or was not, justified in its action of terminating the drilling of the deep test well. Under the circumstances there is no need to determine this question.

Our examination of the record convinces us that the paramount idea and purpose on the part of defendant in negotiating and making the agreements with plaintiff was to secure a deep test well that would test the productivity of the Basal Oil Creek Sand. In addition to the value of a producing well from this sand there was also the important feature of the geological knowledge that defendant would acquire and the influence this would have on defendant in determining whether it would expend the large sums (supra) necessary in securing renewals of a large number of leases that would soon expire. Such a test well was not drilled.

It is our opinion that plaintiff's letter of January 11, 1957, supra, is determinative of the merit of defendant's proposition of error now under discussion. In that letter the plaintiff recited its understanding of the 1956 agreement and then categorically stated it had abandoned the well and did not intend to attempt the additional well in accordance with the option provided in the contract. We need not determine whether plaintiff had the right under the contract to elect not to perform these acts or whether this constituted a breach of the agreement. The only conclusion is that plaintiff abandoned performance of those acts the contract required plaintiff to do before it had the right to share in the subject renewals and new leases.

In Lewter v. Holder, Okl., 348 P.2d 845, 848, supra, it is stated:

"Rights acquired under a contract may be abandoned or relinquished by agreement or conduct clearly indicating such purpose, but to constitute an abandonment an actual intent to abandon must be shown. 17 C.J.S. Contracts § 412, p. 899. In Kizziar v. Pierce, 204 Okl. 51, 54, 226 P.2d 941, 945, this is said:

'(6) In 1 Am.Jur. Abandonment, § 8, it is pointed out that the elements of abandonment are: (1) an intention to abandon; and (2) an external act whereby such intention is carried into effect. The intention to abandon is the paramount inquiry.' "

See also Richardson v. Lawler, 204 Okl. 484, 231 P.2d 671, 674.

Plaintiff clearly expressed an intention to abandon its right under the 1956 agreement to the subject leases and carried such intention into effect by the letter of January 11, 1957, and in not proceeding further under the agreement to drill a deep test well.

It is our conclusion that the trial court erred in awarding to plaintiff a one half interest in renewals and leases acquired by defendant in the outlined area between August 21, 1956, and October 18, 1957, and in the 14 renewals thereof that were acquired by defendant subsequent to October 18, 1957.

Our conclusions herein render moot the propositions raised by defendant in regard to the accounting feature of this appeal.

For the reasons herein stated the judgment rendered by the lower court is reversed with directions to render judgment in favor of the defendant.

HALLEY, C. J., JACKSON, V. C. J., and WILLIAMS, BLACKBIRD, IRWIN, BERRY and HODGES, JJ., concur.