**In re James R. BECK dba J.C. Penney Beauty Salon, Debtor.**

**Bankruptcy No. 80–00285.**

United States Bankruptcy Court, D. Hawaii.

Oct. 15, 1982.

John A. Chanin, Honolulu, Hawaii, former Atty., for debtor.

Ross Hutchins, Tulsa, Okl., for debtor.

Ronald K. Sakimura, Honolulu, Hawaii, for Penney.

Nicholas Dreher, Honolulu, Hawaii, for First Hawaiian Bank.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JON J. CHINEN, Bankruptcy Judge.

On January 9, 1981, J.C. Penney Company, Inc. (hereafter "Penney"), on behalf of the 33 former employees of James R. Beck, the Debtor herein, filed an Application for Payment of Post-Petition Employee Wages as Administrative Expenses Pursuant to Section 503(b)(1) and for Distribution of Priority Wage Claims Pursuant to Section 507(a)(3) of the Bankruptcy Code.

On February 9, 1981, First Hawaiian Bank (hereafter "FHB"), which claims to be a secured creditor, filed its Application for Abandonment of Collateral Pursuant to Section 554(b) of the Bankruptcy Code. FHB claimed its secured debt to be in excess of $42,000.00, which includes $21,140.23 in principal, $3,958.68 in interest through January 31, 1981, and approximately $7,000.00 in attorney's fees.

On February 23, 1981, the Law Offices of John A. Chanin, attorney for the Debtor, filed an Application for Final Allowance of Compensation and Reimbursement of Costs and Expenses. Applicant Chanin requested a total amount of $22,375.26 for services rendered, including general excise tax and costs.

The above Application for Wages and Application for Abandonment were heard on March 13, 1981. Present were Nicholas Dreher and Terry Day for FHB, Ronald Sakimura for Penney, which represented the 33 former employees of James R. Beck, the Debtor, and Patrick Taomae for James R. Beck, (hereafter the "Debtor"). Following the hearing, the Court took the matter under advisement and granted leave to the attorneys to file additional memoranda.

The Application for Final Allowance of Compensation was heard on May 1, 1981. Present were John A. Chanin and Patrick Y. Taomae representing the Debtor, Ronald Sakimura for Penney, and Nicholas Dreher for FHB. The Court requested revised time sheets from John A. Chanin and took the matter under advisement. By stipulation of counsel, various memoranda were filed, with the last memorandum being filed on May 21, 1981 by Penney on behalf of the 33 former employees of Debtor.

There are several issues before this Court:

1. Did FHB have a perfected security interest in the pre-petition net receipts held by Penney before it turned over said net receipts to Debtor and his attorney?

2. If FHB had a perfected security interest in the pre-petition net receipts, what amount is FHB entitled to out of said net receipts, both pre-petition and post-petition, which were held by Penney?

3. Do the former employees have priority over FHB to the funds which were held by Penney?

4. Was the FHB security agreement a preferential transfer for or on account of an antecedent debt?

Based upon the evidence adduced, the memoranda and records herein and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. James R. Beck, dba J.C. Penney Beauty Salon, (hereafter "Debtor"), entered into a revolving loan with FHB beginning in June of 1978 and continuing until Debtor filed his Chapter 11 Petition on May 16, 1980. Every month, Debtor drew approximately $30,000.00 to $35,000.00 from FHB and every month he repaid the previous debt and received the proceeds of his next draw.

2. On June 2, 1978, FHB entered into a security agreement based on those loans with Debtor which described the collateral subject to the security interest as follows:

All machinery, equipment, furniture, fixtures and inventory now owned or otherwise held by debtor and used in connection with its business and all renewals and replacements thereof and/or additions thereto, now owned or hereafter acquired. All accounts receivables, contract rights, chattel paper, instruments, general intangibles and rights to payment of every kind including lease rentals now or at any time hereafter arising out of the business of the debtor; all interest of the debtor in any goods, the sale or lease of which shall have given or shall give rise to any of the foregoing.

3. A UCC–1 financing statement describing the same collateral was filed on June 28, 1978 in the Bureau of Conveyances of the State of Hawaii in Liber 12982, page 565.

4. Commencing on June 29, 1979, FHB proposed a new security agreement which differed from the security agreement of June 2, 1978. On May 12, 1980, FHB and the Debtor executed the new security agreement covering the following collateral:

All of debtor's inventory now owned or hereafter acquired and the proceeds thereof; all of debtor's existing accounts receivable and all of debtor's accounts receivable which come into existence and the proceeds thereof; all of debtor's equipment, machinery, trade fixtures and furniture now owned or hereafter acquired and the proceeds thereof.

5. On May 16, 1980, the Debtor filed a Chapter 11 petition.

6. Under the license agreements wherein the Debtor had occupied two premises owned by Penney, Penney was entitled to retain possession of the net receipts (gross receipts less monies owing Penney) ordinarily owed by it to the Debtor, for the purpose of discharging Debtor's obligations and liabilities to Penney and to third parties in the event Debtor failed to perform those obligations.

7. Penney did retain some funds pursuant to the license agreements immediately prior to the filing of the bankruptcy petition. While in possession of these funds but prior to making any disbursements, Penney learned that Debtor had filed his Chapter 11 Petition and thus retained the funds awaiting further orders of this Court. On May 23, and May 30, 1980, Penney disbursed the total sum of $20,888.05 for employees' payroll and related taxes respectively from the net receipts. The payments were made for the pay period ending May 15, 1980 through checks made payable to Debtor and FHB as joint payees, who in turn made the actual payments of such payroll and related taxes.

8. On June 6 and June 16, 1980, Penney disbursed the total sum of $15,367.61 for employee's payroll and related taxes respectively for the pay period May 16, 1980 and ending on May 31, 1980. FHB was aware of these disbursements but made no objection and took no action to prevent the same.

9. Following a hearing on June 12, 1980, this Court on June 19, 1980, entered an Order Granting Preliminary Injunction. Said Order in effect directed Penney to pay over to Debtor's attorney pre-petition funds then in possession of Penney, less the amount owed Penney pursuant to the license agreements. Said Order also authorized Penney to pay the employees of Debtor from post-petition funds and to provide an accounting of all expenditures, for both pre-petition and post-petition funds at the

time that the funds are turned over to the Debtor.

10. This Order of June 19, 1980 was later amended on the same day to permit the use of pre-petition funds if necessary to meet the employees' payroll provided that, to the extent pre-petition funds were used to pay payroll, post-petition funds would be substituted thereafter to cover any demonstrable security interest held by FHB.

11. On or around June 24, 1980, after Penney had turned over certain funds to John A. Chanin, Debtor's attorney, pursuant to the June 19, 1980 Order of this Court, the Debtor opened a trust account, hereinafter referred to as "Trust Account", with an initial deposit of $14,549.25.

12. On June 27, 1980, pursuant to the June 19, 1980 Order of this Court, Penney did furnish to the attorneys for Debtor and FHB an Accounting of Retained Funds. The accounting showed the following transactions involving monies retained by J.C. Penney Company, Inc. from the receipts of Debtor's beauty salon operations:

| | Total |
|---|---|
| Amount Retained From Receipts 04/16/80 to 04/26/80 | $21,742.48 |
| Dollars Advanced For Payroll Period Ending 05/15/80, Check #22317, Dated 05/23/80 to First Hawaiian Bank and James R. Beck | ($19,804.63) |
| Dollars Advanced For Payroll Taxes, 05/15/80 Payroll Period Check #22433, Dated 05/30/80 to First Hawaiian Bank and James R. Beck | ($ 1,083.42) |
| Balance 05/30/80 | $ 854.93 |
| Amount Retained From Receipts 04/27/80 to 05/31/80 | $50,279.74 |
| Balance 06/01/80 | $51,134.67 |
| Paid 06/06/80 to Beck's Employees For Period Ending 05/31/80 | ($ 8,739.21) |
| Paid 06/16/80 to Internal Revenue Service for 05/31/80 Payroll, Check #22592 | ($ 1,486.14) |
| State Tax Collector, Check #22593 | ($ 403.10) |
| Hawaiian Life Insurance for TDI, Check #22594 | ($ 34.10) |
| HMSA, Check #22599 | ($ 1,665.66) |
| Thompson Budar Insurance Agency, Check #22641 | ($ 1,304.00) |
| Kaiser, Check #22602 | ($ 1,735.40) |
| Balance 06/17/80 | $35,767.06 |
| Paid 06/19/80 to Beck's Employees For Payroll Period Ending 06/15/80 | ($14,536.77) |
| Paid 06/19/80 to Internal Revenue Service, Check #22682 | ($ 4,713.27) |
| Paid 06/19/80 to State Tax Collector, Check #22683 | ($ 1,225.04) |
| Paid 06/19/80 to Hawaiian Life Insurance, TDI, Check #22684 | ($ 87.62) |
| Paid 06/19/80 to Kaiser, Check #22685 | ($ 216.42) |
| Paid 06/19/80 to HMSA (medical) Check #22686 | ($ 177.37) |
| Paid 06/19/80 to HMSA (dental) Check #22687 | ($ 151.32) |
| Payment to John A. Chanin, Atty. Check #22688 | ($14,659.25) |
| Balance 06/20/80 | -0- |

13. On July 1, 1980, this Court entered an order stating that Debtor's License Agreements had been properly terminated by Penney, whereupon the Debtor ceased its operations as of July 5, 1980.

14. On January 5, 1981, this Court ordered the sale of Debtor's furniture, fixtures, equipment and inventory to Penney for $19,207.12, and further ordered that the sum be applied as follows: (a) payment of

**300**

$15,347.35 to Bank of Hawaii in full satisfaction of its secured debt and (b) payment of $3,859.77 to FHB in partial satisfaction of its secured debt.

15. Then, pursuant to a March 13, 1981 Order of this Court, Penney submitted to FHB a report of gross sales less expenses for the period April 26, to May 15, 1980. The report shows the following:

GROSS SALES OF
JAMES R. BECK dba J. C. PENNEY BEAUTY SALON
FROM APRIL 27, 1980 to May 15, 1980

| | |
|---|---|
| Amount retained from receipts for April 16, 1980 to April 26, 1980 | $21,742.48 |
| Gross sales of James R. Beck dba J. C. Penney Beauty Salon from April 27, 1980 to May 15, 1980 | $32,342.62 |
| Disbursement of license fee and other expenses to J. C. Penney pursuant to License Agreement for the period from April 27, 1980 to May 31, 1980 | ($12,010.24) |
| Disbursement for payroll and taxes pursuant to License Agreement for the payroll period ending May 15, 1980 by checks payable to First Hawaiian Bank and James R. Beck | ($20,888.05) |
| | $21,188.61 |

16. At the time of the hearing on March 13, 1981, the following transactions had occurred with respect to the Trust Account administered by the Law Offices of John A. Chanin:

| Transactions | Date | Deposits | Disbursements | Balance |
|---|---|---|---|---|
| 1 | 06/24/80 | $14,549.25 | | $14,659.25 |
| 2 | 07/03/80 | 39,264.93 | | 53,924.18 |
| 3 | 07/08/80 | | $11,000.00 | 42,924.18 |
| 4 | 07/29/80 | 8,311.78 | | 51,235.96 |
| 5 | 01/08/81 | 19,207.12 | | 70,443.08 |
| 6 | 01/20/81 | | 3,859.77 | 66,583.31 |
| 7 | 01/20/81 | | 15,347.35 | 51,235.96 |
| | | $81,443.08 | $30,207.12 | $51,235.96 |

17. With respect to Transactions 1, 2 and 4, the funds deposited into the Trust Account in the total amount of $62,235.96 were received from J.C. Penney pursuant to the License Agreements. No evidence was presented to show whether and to what extent such funds are deemed to be pre-petition funds and/or post-petition funds.

18. With respect to Transaction 3, the funds in the amount of $11,000.00 disbursed from the Trust Account to Paul Marzioli, the then manager of the Debtor, were used to pay post-petition payroll and corresponding taxes and employees' benefits.

19. With respect to Transaction 5, the funds deposited into the Trust Account in the amount of $19,207.12 were derived from J.C. Penney's purchase of the Debtor's furniture, fixtures, inventory, and equipment.

20. With respect to Transactions 6 and 7, the funds in the amount of $3,859.77 and $15,347.35 were disbursed from the Trust Account to First Hawaiian and Bank of Hawaii, respectively. The former disbursement was in partial satisfaction of FHB's security interest in Debtor's furniture, fixtures, equipment and inventory which had been sold, while the latter disbursement

was in full satisfaction of Bank of Hawaii's security interest in such collateral. All disbursements were pursuant to an order entered by this Court on January 5, 1981.

21. Accordingly, there is presently the amount of $51,235.96 in the Trust Account. Other assets of the Debtor include the amount of $1,466.08 in the Debtor's City Bank checking account and the amount of $3,500.00 in Debtor's FHB checking account.

22. The total amount of assets of the Debtor available for distribution, hereinafter referred to as "Available Funds", is the approximate amount of $56,202.04, as outlined below.

| | |
|---|---|
| John A. Chanin (trust account) | $51,235.96 |
| City Bank (checking account) | 1,466.08 |
| First Hawaiian Bank (checking account) | 3,500.00 (approx.) |
| Total | $56,202.04 (approx.) |

23. FHB contends that it has security interest in the following amounts:

| | |
|---|---|
| 1. Principal | $31,140.23 |
| 2. Interest through January 31, 1981 | 3,958.68 + interest at 16.356826% |
| 3. Attorney's fees | 7,000.00 |

FHB further contends that out of the available funds held in the Trust Fund, the following sums should be calculated as being pre-petition net receipts and subject to FHB's claims:

| | |
|---|---|
| Pre-petition gross receipts | $54,085.16 |
| Pre-petition license fees and other expenses disbursed to J.C. Penney | ( 6,005.12) |
| Balance | $48,079.98 |

24. In Debtor's Application for Final Allowance of Compensation and Reimbursement of Costs and Expenses filed on February 23, 1981, John A. Chanin requests an award in the amount of $20,906.75, plus general excise tax of $836.27, and the sum of $632.24 for reimbursement of costs and expenses.

25. To date, the Law Offices of John A. Chanin has not filed revised time sheets to supplement the Application for Final Allowance of Compensation as requested by this Court.

26. These Findings of Fact insofar as they are Conclusions of Law are incorporated by reference in the Conclusions of Law as hereinafter stated.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. Section 1471.

2. The original security agreement between Debtor and FHB was dated June 2, 1978 and the types of collateral covered included, *inter alia*, "[a]ll accounts receivables, contract rights, chattel paper, general intangibles and rights to payment of every kind."

3. A UCC financing statement describing the same collateral as the June 2, 1978 security agreement was filed with the Bureau of Conveyances on June 28, 1978. This financing statement, however, failed to cover proceeds by its terms.

4. Commencing on June 29, 1979, the Debtor and FHB entered into a series of security agreements each month, concluding with a security agreement dated May 12, 1980. The description of the collateral covered by these additional security agreements included, *inter alia*, "all of debtor's existing accounts receivable and all of debtor's accounts receivable which come into existence," but unlike the June 2, 1978 security agreement, the subsequent security agreements did not include "contract rights, chattel papers, general intangibles and rights to payments of all kind."

5. Since a security agreement is a contract between two parties, the laws relative to contracts are applicable in determining the relationship between the June 2, 1978 security agreement and the May 12, 1980 security agreement.

6. As a general rule, an agreement to rescind a contract need not be express and can be implied. Thus, a contract may be rescinded by the mere making of a new agreement. *See* 17 *Am.Jur.*2d, Contracts § 493 (Implied Rescission—by new agreement) at 956–966.

■ 7. It is well-settled that a subsequent agreement complete in itself and covering the same subject matter as a former agreement operates as a rescission of and a substitute for the former agreement. In *Circle v. Jim Walter Homes, Inc.,* 470 F.Supp. 39 (W.D.Okl.1979), the court stated:

A subsequent contract covering fully the subject matter of a former contract operates as a rescission of and substitution for a former contract. *Id.* at 43.

■ 8. It has been held that where two contracts between the same parties are inconsistent, the later contract is presumed to supersede the earlier contract. *Pasotex Petroleum Co. v. British-American Oil Producing Co.,* 431 P.2d 373 (Okl.1967); 6 *Corbin,* Contracts § 1296 (2d ed. 1962). And where the later contract is only partly inconsistent, the earlier contract is only superseded to the extent of the inconsistency. *Hall v. Professional Leasing Associates,* 550 S.W.2d 392 (Tex.Civ.App.1977).

■ 9. The May 12, 1980 security agreement is inconsistent with the June 2, 1978 security agreement. The description of the collateral in the former is more limited in scope than the description of the collateral in the latter. As a result of this inconsistency, the May 12, 1980 security agreement supersedes the June 2, 1978 security agreement. Even if the entire security agreement is not superseded, the description of the collateral in the June 2, 1978 security agreement is superseded, rescinded, and replaced by the description of the collateral in the May 12, 1980 security agreement.

10. The facts and circumstances surrounding these transactions support the foregoing interpretation. The subsequent narrowing of the collateral description was obviously intended to substantively alter the collateral. Otherwise, there would be no need to enter into the May 12, 1980 security agreement. This is also true for the 13 separate security agreements executed by Debtor and FHB between June 1979 and May 1980.

11. Although Mr. Fujioka of FHB testified on March 13, 1981 that the series of new security agreements commencing in June of 1979 and continuing until May of 1980 were entered into as a result of a change in the management at the Kapiolani Branch of FHB and as a precautionary measure, the intent of the execution of these new security agreements cannot be ascertained from Mr. Fujioka's testimony alone. Since such security agreements are contracts to which there were two parties, the intent of such security agreements must be derived from the intent of both parties. FHB has not clearly established that the intent of the subsequent security agreements was not in fact to supersede and rescind the prior security agreements. No evidence was presented regarding the Debtor's intent.

12. Consequently, the only collateral in which FHB holds an alleged security interest is the collateral described in the May 12, 1980 security agreement, namely, "[a]ll of the [d]ebtor's existing accounts receivable and all of the [d]ebtor's existing accounts receivable which come into existence and the proceeds thereof."

■ 13. Although the June 28, 1978 UCC financing statement covers collateral which includes "contract rights, chattel paper, instruments, general intangibles and rights to payment of every kind," as well as "accounts receivable", it cannot expand the collateral description as set forth in the May 12, 1980 security agreement, which only covered "accounts receivables". *Mitchell v. Shepherd Mall State Bank,* 458 F.2d 700 (10th Cir.1972). A financing statement cannot add collateral not described in the security agreement. *In Re Mann,* 318 F.Supp. 32, 36 (W.D.Va.1970).

14. By virtue of the above security agreement, FHB claims a security interest in the net proceeds payable to Debtor by Penney under the two license agreements. Under the license agreements, Debtor was considered an independent contractor and agreed to operate two beauty salons in the spaces assigned by Penney. Debtor agreed to turn over to Penney at the end of each day the daily gross cash proceeds received from the beauty salons. After deducting

certain costs as set forth in the license agreement, on the first day of each month, Penney agreed to advance to Debtor 70% of the net monthly receipts and to turn over the balance of the next monthly receipts on the 20th of each month. If there were any deficit, Debtor agreed to reimburse Penney. FHB claims that Debtor's contractual right to receive net receipts fall into the category of accounts and accounts receivable.

15. The Debtor's attorney and the former employees of Debtor contend that the payments of the net proceeds due Debtor from Penney under the license agreements are not for goods sold or services rendered by Debtor to Penney and as such are not considered accounts receivable, but rather contract rights in which FHB has no security interest.

16. In Hawaii prior to July 1, 1979, types of collateral under the UCC included accounts, contract rights, and general intangibles. To streamline the description of collateral the term "contract right" was deleted. The amendment to the UCC was adopted in Hawaii in 1978 and made effective on July 1, 1979. *See* Sections 490:9–106 and 490:11–101 of the Hawaii Revised Statutes ("H.R.S.").

17. The deletion of the words "contract right" from the UCC definition of collateral is explained by Peter Coogan, special consultant to the Committee to Review Article 9 which made the 1972 revisions to Article 9, and which were adopted in Hawaii:

Peter, we go on next to contract rights. How important is the deletion of contract rights as a class of collateral under the code?

MR. COOGAN: I would say that is a minor change. It is a clarifying change only. It was discovered that we have really had too many categories of collateral; we could, for instance, very well have done away with farm products and just talked about the inventory of a farmer without any loss of substance; we did not do that. But with respect to contract rights, there was no impelling reason for keeping it, contract rights were allowed to fall into two other cate-

gories. If contract rights arose out of a sale of goods or the vendering of services, they fell into accounts; the definition of account was changed so that future accounts could be included, which were not included under the old definition; if contract rights did not arise out of the rendering of services or the sale of goods, they fell into the general intangibles category. This change was not of any world-shaking importance; it did require deletion of that term in a number of places, but nowhere did that substantively change the law to any extent.

1 Bender's UCC Serv. § 3AA.06 *Elimination of Contract Rights,* at 3AA–9 (1980).

18. The payments from Penney to the Debtor were not made for goods sold or for services rendered but were made pursuant to the license agreements. Under the terms of the license agreements, Penney collected from the Debtor the daily proceeds of its business, and then from the gross receipts collected, Penney deducted the payments and reimbursements to which it was entitled under the license agreements. Penney would then pay Debtor the balance from the monthly receipts. Thus, Penney's obligation to pay Debtor the net receipts arose under the license agreements and not because of any goods sold or services rendered to Penney by the Debtor.

19. Since the cash proceeds in possession of Penney and payable to Debtor under the license agreements were not for goods sold or services rendered, the net receipts are not accounts or accounts receivable, and thus are not collateral in which FHB has a security interest.

20. FHB also claims a security interest in the proceeds from the Debtor's accounts and accounts receivable. Under H.R.S. Section 490:9–306(1) the term "proceeds" includes whatever is received when collateral or proceeds are collected or otherwise disposed of.

21. The pertinent part of H.R.S. Section 490:9–306 which was in effect at the time of filing of the financing statement provides as follows:

§ 490:9–306 "Proceeds"; secured party's rights on disposition of collateral.

(1) "Proceeds" includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are "cash proceeds." All other proceeds are "noncash proceeds."

(2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

(3) The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten days after receipt of the proceeds by the debtor unless

(a) A filed financing statement covering the original collateral also covers proceeds; or

(b) the security interest in the proceeds is perfected before the expiration of the ten day period.

(4) In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest

(a) In identifiable noncash proceeds;

(b) In identifiable cash proceeds in the form of money which is not commingled with other money or deposited in a bank account prior to the insolvency proceedings;

(c) In identifiable cash proceeds in the form of checks and the like which are not deposited in a bank account prior to the insolvency proceedings;

(d) In all cash and bank accounts of the debtor, if other cash proceeds have been commingled or deposited in a bank account, but the perfected security interest under this paragraph (d) is

(i) Subject to any right of set-off; and

(ii) Limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days before the institution of the insolvency proceedings and commingled or deposited in a bank account prior to the insolvency proceedings less the amount of cash proceeds received by the debtor and paid over to the secured party during the ten day period.

22.	Under section 490:9–306(3) a security interest in proceeds is continuously perfected if the interest in the original collateral was perfected but it becomes unperfected ten days after receipt of the proceeds by the Debtor unless either the filed financing statement which covered the original collateral also covers proceeds or the security interest in proceeds is perfected before the expiration of the ten day period.

23.	In the instant case, FHB's financing statement did not cover proceeds nor did FHB perfect a security interest in the proceeds during the ten day period. Therefore, FHB does not have a perfected security interest in the proceeds from the Debtor's accounts or accounts receivable.

24.	Section 490:9–306(2) provides for the continuation of a security interest in collateral notwithstanding the disposition thereof and in any identifiable proceeds including collections received by the debtor. FHB argues that the proceeds from the Debtor's accounts receivable are identifiable. The Court concludes, however, that the monies were commingled and are not identifiable proceeds.

25.	As to the issue of whether or not the security agreement of May 12, 1980 is subject to avoidance of transfer pursuant to Section 547 of the Bankruptcy Code, the Court finds there was no preferential transfer to FHB.

26. In order to avoid the transfer of debtor's property, the trustee or debtor-in-possession must prove five separate elements under 11 U.S.C. § 547(b)(1)–(5). Failure to prove any one of the five elements negates the debtor-in-possession's power to avoid the transfer of property. But even if all the elements of subsection (b) are proven, under section 547(c), certain transfers may not be avoided as preferential. More specifically, Section 547(c)(1) states that a transfer may not be avoided to the extent that it was (A) intended by the debtor and the creditor to be a contemporaneous exchange for new value given to the debtor, and (B) in fact a substantially contemporaneous exchange.

27. The April and May, 1980 transfers did not involve obligations substituted for existing obligations since the preceding loans had already been paid before new value was given. A contemporaneous exchange for new value was intended and there was in fact a contemporaneous exchange for new value. Thus, the Court finds that there was no preferential transfer to FHB.

28. Although the security agreement of May 12, 1980 was not a preferential transfer to FHB, the Court has found that FHB did not have a perfected security interest in the pre-petition net receipts held by Penney to be turned over to Debtor. Therefore, the employees of Debtor who claim the sum of $3,317.92 for services rendered during the 90-day period immediately before the commencement of this case are entitled to priority over FHB under Section 507(a)(3).

29. Section 507(a)(3) of the Bankruptcy Code expressly provides priority status to "wages, salaries, or commissions" earned by employees within 90 days of the date of filing of the petition. Vacation pay earned during the 90-day pre-petition period is also entitled to priority under Section 507(a)(3). *In re Schatz Federal Bearings Co.,* 6 B.C.D. 749, 5 B.R. 549 (S.D.N.Y.1980).

30. The foregoing priority claims, however, are payable only after the other priority claims set forth in section 507(a)(1) and (2) are first paid.

Based on the foregoing, the Court finds as follows:

A. FHB does not have a perfected security interest in the net proceeds received by Debtor from Penney.

B. There was no preferential transfer to FHB by virtue of the May 12, 1980 security agreement.

C. The available funds should be paid on a pro rata basis among all the administrative expenses, including wages of the former employees and services rendered by the attorney for the Debtor. The Court reserves ruling on John Chanin's fee application at this time since revised time sheets have not been filed to date.